Calvin Stevenson **BRIGHT**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 95–CF–1569.

District of Columbia Court of Appeals.

Argued June 24, 1997.
Decided July 31, 1997.

Tanya Chutkan, Public Defender Service, with whom James Klein, Public Defender Service, and Gretchen Franklin, Public Defender Service, were on the brief, for appellant.

Colleen Covell, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese, III, and Kenneth C. Kohl, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and REID, Associate Judges, and PRYOR, Senior Judge.

REID, Associate Judge:

After a jury trial in June 1995, appellant Calvin Bright was convicted of two counts of murder in the first degree while armed (premeditated), in violation of D.C.Code §§ 22–2401, –3202 (1996); carrying a pistol without a license, in violation of D.C.Code § 22–3204(b); and unlawful possession of ammunition, in violation of D.C.Code § 6–2361(3) (1995).[1] He filed a timely appeal, challenging several rulings of the trial court. We reverse Bright's ammunition conviction and affirm the judgment of the trial court in all other respects.

---

1. Bright was sentenced to consecutive terms of thirty years to life on each murder conviction; five to fifteen years for possession of a firearm during a crime of violence; and 180 days each on the charges of carrying a pistol without a license and unlawful possession of ammunition.

## FACTUAL SUMMARY

An eyewitness, John Boatwright, saw Bright grab, hold and shoot Tammy Peay in the head around 4:30 a.m. on July 24, 1994, near Central Place and Gallaudet Street, N.E. Another eyewitness, Dephanie Jordan, was with Boatwright and heard gunshots as she saw Bright, whom she had known from the neighborhood for four or five years, holding and hugging the victim. Both eyewitnesses watched as Bright pursued William "Tink" Ramsey who had been with Peay. Ramsey's leg was in a cast and he was on crutches as he tried to elude Bright's pursuit. Bright fired three or four shots at Ramsey and then rode away on a bicycle.

Both eyewitnesses got a clear look at Bright. Although it was still dark, street lights were on. Jordan "looked [Bright] dead in the face," and later identified him both from a police photo array and in court. She was "[one] hundred percent sure" that Bright was the person who committed the murders.[2] Boatwright, who admitted taking drugs six hours earlier on the night of the murders, also identified Bright from a police array and in court, even though he initially told the Grand Jury that he could not see the perpetrator's face because it was dark outside.[3]

On July 29, 1994, five days after the murders of Peay and Ramsey, the police executed a search warrant at an apartment in the 1800 block of Providence Street, N.E., where Bright resided with Raymond Belzer. Both men were present when the police arrived. At the time of the murders, Bright had stayed at the apartment for about a year and a half and slept in the living room. The police seized a .38 round of ammunition from a bookshelf in the living room, as well as clothing and a key to the apartment, which the police found in the front pocket of Bright's pants. The round of ammunition formed the basis of Bright's conviction for the single count of possession of ammunition charged. Although the round of ammunition seized fit a .38 caliber gun, it did not have the same mark as the shell casings found on the ground near the victims' bodies. These bore the mark "WIN" on the bottom.[4]

Bright was arrested three weeks after the murders while he was riding a bicycle down the street from the murder scene. The police conducted a second search of the apartment where Bright stayed and found personal papers and postmarked envelopes with his name on the bookshelf in the living room where he slept.

At trial, the government presented the testimony of Donald Johnson, who also stayed at the Providence Street apartment. Johnson said he heard Bright mention one of the victim's names (Ramsey) on two or three occasions prior to the murders. In late March, he heard Bright complaining that Ramsey owed him "some money or something" and that he, Bright, was going to "f___k [Ramsey] up ... mess [Ramsey] up." However, Johnson also testified that Bright would utter similar words when he became angry with someone.

Bright presented only two witnesses in his behalf, two police officers who performed official duties at the crime scene. In relation to his misidentification defense, he sought to use their testimony to cast doubt on the testimony of eyewitnesses Jordan and Boatwright by showing that there was no gray van at the scene of the crimes on July 24, 1994. Jordan testified that she was standing next to a gray van when Bright began shooting. One officer could not remember the types of vehicles parked on the street that night; the other officer stated that no van was parked at the scene while she was there.

2. Jordan waited five days before talking to the police because she was scared. She admitted that she used drugs and drank beer on the night of the murders.

3. Jordan and Boatwright had prior convictions. Jordan was convicted of prostitution in 1993 and 1994. Boatwright was convicted of petty larceny in 1991. At the time of the murders, an arrest warrant was pending against him in Maryland for shoplifting and unauthorized use of a motor vehicle. Because of the outstanding arrest warrant, he falsely told the Grand Jury that his name was John Hopkins.

4. "WIN" stands for Winchester brand ammunition. It is not clear from the record on appeal whether the bullets taken from the victims' bodies contained any brand markings.

Bright raises several challenges to his convictions. We focus only on two of his contentions.

## ANALYSIS

### The Severance Issue

Bright asserts that under Super. Ct.Crim. R. 14, the charge of unlawful possession of ammunition should have been severed from the other charged offenses.[5] We agree but reverse only his ammunition possession conviction.

Bright claims that "evidence of the July 29 ammunition possession was irrelevant to the July 24 murder, and vice versa." He also maintains that the murders and the ammunition possession were not "closely connected in time," and the ammunition found in the Providence Street apartment "was of a different brand than the ammunition used in the shooting." Further, he argues, "evidence of each crime would be [in]admissible in a separate trial of the other crime" because it does not fall within one of the exceptions articulated in *Drew v. United States*, 118 U.S.App. D.C. 11, 16, 331 F.2d 85, 90 (1964) (other crimes evidence may be admitted to show motive, intent, absence of mistake or accident, a common scheme or plan, or identity).

The government contends that the trial court did not abuse its discretion in denying Bright's motion for severance, and the evidence of each offense would have been mutually admissible in separate trials. Moreover, possession of the ammunition evidence constituted "direct and substantial proof" of Bright's involvement in the murders of Peay and Ramsey. In addition, in a separate trial involving the ammunition charge, the probative value of the murder evidence would not be " 'substantially outweigh[ed]' by its prejudicial effect." Finally, the government asserts, because the trial court kept the evidence of each crime separate and distinct,

and instructed the jury to consider it separately, there was no prejudice.

 "A motion for severance on the ground of prejudicial joinder is committed to the sound discretion of the trial court." *Arnold v. United States*, 511 A.2d 399, 404 (D.C.1986). We "will reverse the denial of a motion to sever counts under Super. Ct. Crim. R. 14 only upon a clear showing of abuse of discretion." *Parks v. United States*, 656 A.2d 1137, 1139 (D.C.1995) (referencing *Winestock v. United States*, 429 A.2d 519, 526 (D.C.1981)). To meet his or her burden under Rule 14, a defendant "must show 'the most compelling prejudice' . . . from which 'the court would be unable to afford protection' if both offenses were tried together. . . . It is not sufficient to show that the defendant would have a better chance of acquittal if the charges were tried separately." *Arnold, supra*, 511 A.2d at 404 (quoting *Winestock, supra*, 429 A.2d at 527). Furthermore,

> When joinder is based on the "similar character" of the offenses, "a motion to sever should be granted unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, *or* (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others."

*Id.* (citation omitted; footnote omitted).

### Mutual Admissibility of the Crimes In Separate Trials

 While considering Bright's motion to sever under Rule 14 and the issue of admissibility of the murder evidence in the ammunition possession trial, the trial court asked the government whether it was "seeking to try it, as mutually admissible evidence of each crime or as to this particular offense being separate and distinct." The trial court added its own view that "[i]t would be difficult, I guess, to try it separate and distinct in light

---

**5.** Bright did not file a written motion to sever. On the first day scheduled for trial, however, he made an oral motion to sever under both Super. Ct.Crim. R. 8(a) (joinder of offenses) and R. 14 which provides in pertinent part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses . . .

in an indictment or information or by such joinder for trial together, the Court may order . . . separate trials of counts, . . . or provide whatever other relief justice requires. . . .

The trial court denied the motion to sever under both Rules 8(a) and 14. Bright does not challenge the R. 8(a) ruling.

of the Court's previous ruling that you can use the ammunition to establish the means of—the Defendant's means of access to or possession of the .380–caliber pistol." Although the government expressed the view that both grounds could be relied on, in denying the motion for severance under Super. Ct.Crim. R. 14, the trial court stated:

I believe that the evidence of the Defendant's possession of a .380–caliber weapon, which the government seeks to establish through its evidence of the murder and the carrying a pistol without a license charge, possession of a firearm during a crime of violence charge, would be probative on the issue of intent as to possessing the .380–caliber ammunition four days later on July 29. It would be mutually admissible at trial.

Now, as to its probativeness, I think the Court maybe could weigh the effect—the prejudicial effect of it and the Court, within [its] discretion, could or may not allow it in, given the fact that evidence of the murder in a separate trial for possession of ammunition may be highly prejudicial; but I still think evidence that will come in on the murder charge establishing that he possessed a .380–caliber pistol would be probative to establish possession or intent, intent or knowledge of the ammunition recovered July 29. So I'm going to deny the motion for severance on Rule 14 grounds.[6]

Thus, the trial court rested its determination of no prejudice on the mutual admissibility of the evidence in separate trials on the ammunition and murder charges, rather than on the ground that "the evidence as to each offense [would be kept] separate and distinct, and thus [would be] unlikely to be amalgamated in the jury's mind into a single inculpatory mass...." *Arnold, supra,* 511 A.2d at 404.

■ Under *Johnson v. United States,* 683 A.2d 1087 (D.C.1996), the ammunition evidence would have been admissible in a separate trial on the murder counts, as well as in a separate trial of the other crimes charged in the indictment against Bright, because it related to the means used to carry out the murders and was probative as to Payne's guilt. Given *Johnson,* the ammunition evidence would not have been excluded as "other crimes" evidence under *Drew v. United States, supra.*[7] "*Drew* does not apply where such evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." *Johnson, supra,* 683 A.2d at 1098. The government relies on the first exception, arguing that Bright's "possession of .38 caliber ammunition on July 29 was direct and substantial proof that five days earlier he was the gunman who had fired the .38 caliber bullets into the victims."

Clearly, the ammunition evidence "[bore] an immediate relationship to the [murders and other charges], both temporally and causally." *Id.* at 1098 n. 11. Contrary to Bright's contention, the murders and the ammunition possession were related temporally. The five-day period between the murders and the seizure of the .38 round of ammunition from Bright's sleeping quarters was insufficient to break the temporal relationship between the two. Moreover, the causal relationship is clear because the victims were killed with .38 caliber bullets. The fact that the casings on the ground contained a brand marking not found on the .38 round of ammunition seized from Bright's apartment is not dispositive. Indeed, when the court asked whether that round of ammunition could "be fired from a .380–caliber gun," defense counsel responded "Yes ..." This court has upheld the admission of similar evidence (there a gun) "not clearly shown to have been used in the killing" but nonetheless linked circum-

---

**6.** The trial judge indicated that "within [his] discretion, [he] could or may not allow it in, given the fact that evidence of the murder in a separate trial for possession of ammunition may be highly prejudicial." Thus, his ruling appears to be somewhat provisional. We see nothing in the record on appeal, however, to indicate that he later revisited the issue. Therefore, that ruling became his final decision on the severance issue.

**7.** In light of this conclusion, we do not need to determine whether the ammunition evidence would have been admissible under one of the *Drew* exceptions.

stantially to it, *Ali v. United States,* 581 A.2d 368, 374–77 (D.C.1990), in that it demonstrated, *inter alia,* that the defendant had the means to commit the charged crime. *Powell v. United States,* 684 A.2d 373, 382 (D.C. 1996). Thus, the ammunition evidence "[bore] an immediate relationship to the [murders and other charges], both temporally and causally" because .38 caliber bullets had been used to murder Peay and Ramsey, and five days later a .38 round of ammunition was found in Bright's sleeping quarters. *Id.* at 1098 n. 11. Consequently, it was direct and substantial proof of the murder charges, and could be admitted in a separate trial concerning the murders. *Id.; see also Powell, supra,* 684 A.2d at 382; *Ali, supra,* 581 A.2d at 377.[8]

■ However, whether evidence of the murders would have been admissible in a separate trial on the ammunition possession charge is a much more difficult issue. The critical inquiry is whether the "probative value [of the murders would be] substantially outweighed by the danger of unfair prejudice" in a separate trial on the ammunition charge. *Johnson, supra,* 683 A.2d at 1099. Significantly, as pointed out, the ammunition charge was not based on Bright's possession of the ammunition used in the shootings but upon his separate possession of similar ammunition five days later. The trial judge acknowledged that "evidence of the murder[s] in a separate trial for possession of ammunition may be highly prejudicial...." Indeed, we conclude that introduction of the evidence of the murders in a separate trial on the ammunition offense "would have created an extreme risk of prejudice no matter what instructions the judge gave regarding the limited use of the evidence." *Parks v. United States,* 656 A.2d 1137, 1140 (D.C.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 198, 133 L.Ed.2d 133 (1995). The murders here were particularly heinous. Bright grabbed, held and hugged Peay while he shot her in the head. Then he relentlessly pursued Ramsey, who hobbled away as fast as he could on crutches with his leg immobilized by a cast, *until* he caught up with him and pumped

bullets into his back and head. Clearly, the "probative value [of evidence regarding the murders would be] substantially outweighed by the danger of unfair prejudice." *Johnson, supra,* 683 A.2d at 1099. Here the prejudice is " 'the most compelling prejudice' ... from which 'the court would be unable to afford protection' if both the offenses were tried together...." *Arnold, supra,* 511 A.2d at 404. Thus, under the mutual admissibility test articulated in *Arnold,* evidence of the murders would be excluded in a separate trial on the ammunition charge.

*Separate and Distinct Evidence In A Single Trial*

· ■ The government maintains that under the second test set forth in *Arnold,* the evidence of the murders could be introduced in a trial including the ammunition charge, because the evidence as to each was "separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass," 511 A.2d at 404 (citation omitted). However, the way in which the trial developed made it virtually impossible to keep the offenses "separate and distinct," and to avoid amalgamation in the jurors minds "into a single inculpatory mass." The evidence concerning the murders and the ammunition possession, as the trial judge recognized, was related and temporally connected. Furthermore, the government did not isolate its witnesses on the murder charges from those on the ammunition offense. In fact, Officers Horne and Mattera, who testified regarding the ammunition charge, were followed by Detective Fox who testified regarding both the murder and the ammunition charges. The government called several witnesses after Detective Fox, including Robert Poole, a firearms expert who testified regarding the casings found at the scene of the crime and the bullets found in the victims' bodies; Dr. Humphrey Germaniuk from the medical examiner's office who discussed the autopsies of the victims' bodies; and Detective Jefferey Mayberry, Detective Fox's partner, who testified regarding his interviews with eyewitnesses Jordan and

8. Because of our conclusion, we need not determine whether evidence of the ammunition would

have been admitted under *Drew* in a separate trial on the murder charges.

Boatwright. Moreover, the government linked the murder and ammunition charges by arguing that the jury should consider the .38 round of ammunition found in Bright's sleeping quarters as evidence that he committed the murders. Given the way in which the testimony concerning the murders and the ammunition possession charges was presented, it was "[likely] to be amalgamated in the jury's mind into a single inculpatory mass," despite the trial court's general final instruction that "[e]ach offense and the evidence which applies to it should be considered separately...."

Accordingly, we reverse Bright's conviction on the ammunition possession charge because as to that count the trial court should have granted a severance. We do not reverse Bright's other convictions, however, because in a separate trial of those charges evidence of the ammunition possession would have been properly admitted—as it was here—for the reasons stated earlier. As to those counts, therefore, the failure to sever did not prejudice appellant. *See* D.C.Code § 11–721(e) (1995).[9]

### The Second Degree Murder Instruction Issue

■ Bright contends that the trial court erred in refusing to give a jury instruction on second degree murder as a lesser included offense. He maintains that "[g]iven the speed with which events unfolded, together with the lack of evidence of motive and premeditation, 'the jury rationally could have opted for second degree' murder." He cites *Shuler v. United States*, 677 A.2d 1014, 1018 n. 6 (D.C.1996) in support of his argument. The government argues that Bright's state of mind was not in issue during the trial, and that there was sufficient evidence of premeditation and deliberation but no evidence to support a second degree murder instruction. The trial judge declined to give the second degree instruction because of the absence of evidence "that shows the second degree murder in this case given the nature of what the

witnesses have said if the jury believes it occurred in terms of how the shooter approached the two decedents and where he shot the two decedents." The trial judge also stated:

> The one thing lacking I think in terms of the Government's evidence on those issues is motive although there was some motive evidence that came out that would, if the jury believes established certain elements, help establish certain elements in the charge of first degree murder. I haven't heard anything yet that would lead the Court to conclude that it warrants a lesser-included offense even though I understand as the Court of Appeals has said that the standard is if there's any evidence of second degree murder. I think there are cases where—the standard is not in every first degree murder case that you should give second degree murder. I believe an argument can always be made that a jury has to decide whether its premeditated or deliberation. So for those reasons, I'll deny the request for second degree murder.

■ As we have said previously, "[t]o justify a lesser included offense instruction, 'there must be evidence to support a finding of guilt on the lesser offense.'" *Shuler, supra*, 677 A.2d at 1017 (citations omitted). Furthermore,

> the *weight* of the evidence supporting the instruction is immaterial; as long as a jury could rationally convict on the lesser-included offense after crediting the evidence, the court must give the instruction no matter how inclined it might be to discount that evidence. [However,] the court is "not required to put the case to the jury on a basis that essentially indulges and even encourages speculations as to bizarre reconstruction."

*Id.* (citations omitted).

Here, the record reveals no dispute regarding Bright's state of mind. His defense theory was misidentification, and thus the

---

9. We do not remand the matter regarding the ammunition possession conviction, as we did the matter at issue in *Long v. United States*, 687 A.2d 1331, 1343 (D.C.1996), because the record is sufficient to determine that evidence of the mur-

ders represented compelling and unfair prejudice to Bright's trial on the ammunition charge, and because "'the court would be unable to afford protection' [since] both offenses were tried together." *Arnold, supra*, 511 A.2d at 404.

458

only issue regarding the murders was the identity of the assailant. Bright's argument concerning the speed of events and the lack of motive evidence lacks merit. "The law requires no particular period of time" for premeditation and deliberation. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.17 (4th ed.1993). It may be "hours, days, or even longer," or "it may cover a span of minutes [or less]." *Id.* at 276. Hence, "speed" is not a controlling factor with respect to premeditation and deliberation. Furthermore, motive is not the only way in which premeditation and deliberation may be established.[10] To establish premeditation and deliberation, the government offered evidence that Bright brought a gun to the scene of the crime, emerged from a "cut" or a path to intercept Peay from behind, killed her with one shot to the head, and then chased Ramsey and shot him three or four times—in his back and head. In addition, Donald Johnson who also stayed in the Providence Street apartment where Bright slept in the living room, testified that he heard Bright complain two or three times prior to the murders that Ramsey owed him "some money or something" and that he, Bright, was going to "f___k [Ramsey] up ... mess [Ramsey] up." Although circumstantial, this evidence, if believed by reasonable jurors, was sufficient to demonstrate premeditation and deliberation. *See Hall, supra*, 454 A.2d at 317–18; *Mills v. United States*, 599 A.2d 775, 782–83 (D.C.1991).

We have said previously that

[p]remeditation and deliberation distinguish first and second-degree murder. "[F]irst-degree murder, with its requirement of premeditation and deliberation, covers calculated and planned killings, while homicides that are unplanned or impulsive, even though they are intentional and with malice aforethought, are murder in the second degree."

*Hall, supra*, 454 A.2d at 317. On the record before us, we see no evidence of unplanned or impulsive murders. Therefore, the trial

judge was not obligated to give a second degree murder instruction. Had the trial judge done so, the jury would have had to disregard the government's evidence and engage in conjecture regarding why and how the two murders might have occurred. As we said in *Shuler, supra*, "the court is 'not required to put the case to the jury on a basis that essentially indulges and even encourages speculations as to bizarre reconstruction.'" 677 A.2d at 1017. Accordingly, we conclude that the trial court properly denied the request for a second degree murder instruction because there was no "evidence to support a finding of guilt on the lesser offense." *Id.*

**Bright's Other Contentions**

 Bright's other contentions have no merit. He complains that the trial court erred in failing to instruct the jury that the absence of evidence of motive was a factor to be weighed in his favor. However, the trial court instructed the jury, *inter alia*, that while "the Government is not required to prove motive, ... evidence of motive or absence of proof of motive can be considered by you in deciding whether the Government has proved the charges beyond a reasonable doubt in this case." He argues that the testimony of Donald Johnson should have been precluded because the government said prior to trial that it would introduce no "other crimes" evidence. The trial court did not abuse its discretion in allowing Johnson's testimony because it was "direct and substantial proof of the charged crime." *Johnson, supra*, 683 A.2d at 1098. Bright does not have standing to raise a Fifth Amendment challenge in behalf of his brother, Charles Mayberry, who testified as a government witness, and indicated that he did not see his brother on the day of the murders. "[A] defendant does not have standing to complain of an erroneous ruling on the scope of the privilege of a witness." *Ellis v. United States*, 135 U.S.App. D.C. 35, 42, 416 F.2d 791, 799 (1969).

---

**10.** In addition to motive, "bringing the weapon to the scene of the crime, and interruption and subsequent continuation of the criminal act," may indicate premeditation and deliberation.

CRIMINAL JURY INSTRUCTIONS, *supra*, No. 4.17 at 278 (referencing *Hall v. United States*, 454 A.2d 314, 317–18 (D.C.1982)).

We also reject Bright's argument that the evidence was insufficient to convict him beyond a reasonable doubt of ammunition possession. The .38 round of ammunition was found on the bookshelf in the living room of the Providence Street apartment where Bright slept. Belzer, who also occupied the apartment on Providence Street, testified that the ammunition was not his and that no one else brought guns or ammunition into the apartment. Thus, viewing the evidence in the light most favorable to the government, as we must, we conclude that reasonable jurors could reasonably infer that Bright constructively possessed the live round of ammunition found on the bookshelf in his sleeping quarters. *See Guishard v. United States,* 669 A.2d 1306, 1312 (D.C. 1995) (citations omitted). Finally, because Detective Mayberry testified that Bright had told him his brother dropped him off at his mother's house before the time of the murders, Bright maintains that he was entitled to an alibi instruction. Neither Bright nor his mother testified at trial. Moreover, the fact that he may have been dropped at his mother's house three hours prior to the murders, does not establish an alibi at the time of the murders. "[T]he alibi instruction is appropriate only when the defense evidence demonstrates the defendant's presence elsewhere for the entire period of time the government's evidence shows he was involved in criminal activity." *Greenhow v. United States,* 490 A.2d 1130, 1134 (D.C.1985) (citations omitted).

Accordingly, for the foregoing reasons, we reverse Bright's conviction on ammunition possession and affirm the judgment of the trial court in all other respects.

*So ordered.*